Robert V. Prongay, Esq. (SBN 270796)
Kevin F. Ruf, Esq. (SBN 136901)
Leanne H. Solish, Esq. (SBN 280297)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com

Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXANDRU LEFTER, Individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>YIRENDAI LTD., YIHAN FANG, YU CONG and NING TANG<br><br>        Defendants. | Case No: 2:16-CV-06437-MWF-AGR<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br><u>**JURY TRIAL DEMANDED**</u> |

Lead Plaintiffs Peggy Dern and Shun Wah So ("Plaintiffs"), by Plaintiffs' undersigned attorneys, individually and on behalf of all other persons similarly situated, allege the following based upon personal knowledge as to Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Defendants' public documents, announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Yirendai Ltd. ("Yirendai" or the "Company"), analysts' reports and advisories about the Company, interviews with former employees of Yirendai, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than defendants and their affiliates, who purchased or otherwise acquired the American Depositary Shares ("ADS") of Yirendai from April 27, 2016 to August 24, 2016, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws (the "Class").  Excluded from the Class are all defendants, the present and former officers and directors of Yirendai and any subsidiary thereof, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.  Also excluded from the Class are persons who have a net profit in purchases and sales of Yirendai ADS or otherwise suffered no compensable damages under the securities laws during the Class Period.

2.      Yirendai is an online consumer marketplace in China that engages in peer-to-peer ("P2P") lending, connecting investors with individual borrowers. Yirendai generates revenue primarily from fees that it charges for matching investors

and borrowers.   Specifically, Yirendai charges borrowers transaction fees for facilitating loan transactions, and it charges investors service fees for using Yirendai's automated and self-directed investing tools.

3.   Since 2007 when the first P2P online lending platform, Pai Pai Dai, was founded, the Chinese P2P industry has proliferated into a giant pie consisting of 3,853 P2P lending platforms brokering a total of RMB 975 billion (approximately US$150 billion) in loans as of the end of 2015.[1]   However, due to the dearth of laws regulating this industry, it has been plagued by fraud and illicit activity; P2P lending has been referred to in China as an industry of "Three Nos," namely: "no entry threshold requirements, no standards, [and] no regulation and enforcement".[2]   Since 2015, many prominent P2P platforms in China, including Ezubao, the Dada Group, and the Kuailu Group, have been charged with engaging in illegal financing and operating Ponzi schemes, involving billions of RMB.

4.   The conduct of lenders and borrowers on these P2P platforms has also generated much controversy.   A *New York Times* article[3] dated June 15, 2016 revealed that in order to secure loans, many women in China are sending unattired pictures of themselves holding their ID cards to P2P lenders as collateral.   Many of these women are then blackmailed by lenders who sometimes demand sexual services when the women cannot repay their debt at interest rates that may approach 30% a week.   The Beijing Youth Daily, the official newspaper of China's Communist Youth League, called this sordid practice "an open secret."

5.   According to an August 31, 2016 article that appeared on Bloomberg.com,[4]   China's banking regulators estimate that there were 1,778

---

[1] http://www.wdzj.com/zhuanlan/guancha/17-3394-1.html
[2] http://www.bjjrj.gov.cn/gzdt/c12-a1539.html
[3] https://www.nytimes.com/2016/06/16/world/asia/to-secure-loans-chinese-women-supply-perilous-collateral-nude-photos.html?_r=0
[4] https://www.bloomberg.com/news/articles/2016-08-31/china-s-p2p-industry-is-basically-a-scam-billionaire-guo-says

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

"problematic" online P2P lending platforms doing business in China.

6. The same Bloomberg article states that the pervasive fraud and controversy involving the Chinese P2P industry has caused Guo Guangchang, head of the Chinese conglomerate Fosun International Limited and a representative of the Chinese People's Political Consultative Conference, to call the entire industry "basically a scam."

7. In particular, the early December 2015 public announcement of the Chinese government's investigation of Ezubao for allegedly defrauding approximately 900,000 investors out of a total amount of over RMB 50 billion (approximately US $7.6 billion) in a mere year and a half shocked the entire Chinese nation, and prompted the Chinese government to "clean up" the P2P lending industry.[5] On December 28, 2015, the China Banking Regulatory Commission ("CBRC") disseminated, for discussion purposes, a draft of the Interim Administrative Measures for the Business Activities of Peer-to-Peer Lending Information Intermediaries (the "Draft Measures"), aimed at regulating the P2P industry.

8. Among other new regulations, the Draft Measures prohibited P2P lenders like Yirendai from conducting business offline. Specifically, the Draft Measures prohibited P2P lenders from acquiring customers via offline channels.

9. According to Yirendai's Annual Report for the year ended December 31, 2015 (the "2015 20-F"), filed with the U.S. Securities and Exchange Commission ("SEC") on April 27, 2016, Yirendai relies heavily on offline channels to acquire business. From 2013 to 2015, about half of Yirendai's borrowers were acquired via offline channels, accounting for more than 60% of the total loans facilitated during those years.

10. Yirendai's 2015 20-F discusses the Draft Measures in great detail. Indeed, the 2015 20-F specifically listed eleven regulations that would prohibit

---

[5] http://www.baike.com/wiki/e%E7%A7%9F%E5%AE%9D

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

certain business actions for P2P lenders.   However, it failed to disclose the one regulation most critical to Yirendai's business: the prohibition on acquiring customers and generating loans from offline channels.

11.   Because of Yirendai's heavy reliance on offline channels to acquire customers and facilitate loans, Yirendai needed to disclose this proposed legislation that placed half of its revenue stream in jeopardy.   Yet, as evidenced by its decision to list eleven other proposed prohibitions, Yirendai selectively chose not to disclose the proposed prohibition on offline business.

12.   Rather, Yirendai's detailed discussion of the other proposed regulations in the Draft Measures, in fact, served to obfuscate and divert attention away from the one provision most damaging to the Company's business.

13.   On August 24, 2016, the CBRC officially implemented the Interim Administrative Measures for the Business Activities of Peer-to-Peer Lending Information Intermediaries ("Measures").   With the exception of a few additions, the Measures were identical to the Draft Measures.   The prohibition on offline customer acquisition and loan facilitation was one of the provisions that became officially promulgated.

14.   On this news, Yirendai ADS plunged $6.92 per share, or 22%, to close at $24.52 per share on August 24, 2016, on unusually heavy trading volume.

## JURISDICTION AND VENUE

15.   The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 8 240.10b-5).

16.   This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

17.   Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b), as a substantial part of the conduct complained of herein occurred in this District.

18.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

19.     Plaintiffs, as set forth in their PSLRA Certifications previously filed with the Court (Dkt. No. 17-2), acquired Yirendai ADS at artificially inflated prices during the Class Period and suffered damages as a result of Yirendai's violations of the federal securities laws.

20.     Defendant Yirendai is a Cayman Islands corporation that operates a P2P lending platform connecting borrowers and lenders in China.  Yirendai purports to have facilitated over $1.37 billion USD in loans from its inception in 2012 through September 2015.  Yirendai is headquartered in Beijing, China.  Yirendai came to the U.S. capital markets via an Initial Public Offering ("IPO") on December 18, 2015; its ADSs trade on the New York Stock Exchange ("NYSE") under the ticker symbol "YRD."

21.     Defendant Ning Tang ("Tang") has been the executive chairman of the board of directors of Yirendai since the Company's inception.  Tang is also the founder and 43.4% shareholder of CreditEase Holdings Limited ("CreditEase"); CreditEase is the parent company of Yirendai as well as Yirendai's controlling shareholder.  Yirendai's 2015 20-F, which Tang personally signed, states that "Our executive chairman, Mr. Ning Tang, has considerable influence over us and our corporate matters."

22.     Defendant Yihan Fang ("Fang") is the Chief Executive Officer ("CEO") of Yirendai, a position that she has held since the Company's inception in 2012.  As CEO, Fang had control over the core operations of Yirendai, including its marketing and customer-acquisition activities.  Fang also signed a Certification pursuant to the Sarbanes-Oxley Act certifying that the 2015 20-F "does not…omit to state a material

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

fact necessary to make the statements made, in light of the circumstances under which statements were made, not misleading with respect to the period covered by this report."

23.   Defendant Yu Cong ("Cong") is Yirendai's Chief Financial Officer ("CFO"), a position he has held since September 2014.  As CFO, Fang had control over the core operations of Yirendai, including its marketing and customer-acquisition activities.  Cong also signed a Certification pursuant to the Sarbanes-Oxley Act certifying that the 2015 20-F "does not…omit to state a material fact necessary to make the statements made, in light of the circumstances under which statements were made, not misleading with respect to the period covered by this report."

24.   Tang, Fang and Cong are sometimes referred to herein as the "Individual Defendants."

25.   Defendant Yirendai and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**The Chaotic Rise of China's P2P Lending Industry**

26.   China's nascent P2P lending industry has experienced dramatic growth since 2011.  At the end of 2011, there were fewer than 50 P2P lending platforms in China.  By 2014, however, the number of such P2P platforms exploded to over 3,853 companies.[6]

27.   At the end of 2014 and 2015, the value of outstanding loans facilitated by P2P lending platforms approached 300 billion RMB (approximately US $46 billion) and RMB 975 billion (approximately US$150 billion) respectively.[7]   In

_____

[6] http://www.wdzj.com/zhuanlan/guancha/17-3394-1.html
[7] http://www.accaglobal.com/content/dam/ACCA_Global/Technical/manage/ea-china-p2p-lending.pdf

comparison, during the same period P2P lending platforms in the United States only reported about $5.5 billion in outstanding loans.[8]

28.   Because of the explosive growth and lack of regulations, the Chinese P2P lending industry has been plagued by fraud and other illicit activity.  In a Q&A published on the CBRC's website on October 10, 2016, the CBRC indicated that as of June 2016, there were over 1,700 "problematic" P2P online lending platforms, accounting for 43.1% of all P2P online lending platforms.[9]  The CBRC further stated: "When faced with defaults and operational difficulties, these problematic companies would escape with the funds, etc., in part due to their capital restraints and limited management capabilities."[10]  Also, "[s]ome [P2P lending] companies financed themselves via funds obtained from P2P lenders and conducted Ponzi schemes by means of fake targets, capital pool, and high returns, etc."[11]  In recent years, many prominent P2P lending platforms have collapsed or been shut down by the Chinese government for illegal activity.

29.   For example, in early 2016, the Chinese government announced that it had arrested the founder of Ezubao and shut down the P2P lending platform, once one of China's most high profile P2P lending sites, for operating a Ponzi scheme that netted himself $7.6 billion dollars, which he used to invest in his personal real estate projects and fund lavish lifestyles for himself and his associates.

30.   Recently, it was revealed that lenders on Jiedaibao, another prominent Chinese P2P lending platform, have been requesting female borrowers to secure their loans with pictures of themselves unattired holding their Chinese IDs.  The lenders would then blackmail delinquent borrowers with demands for sexual favors if they were unable to repay their high interest loans.

---

[8] *Id.*
[9] http://www.bjjrj.gov.cn/gzdt/c12-a1580.html
[10] *Id.*
[11] *Id.*

31.     An August 31, 2016 Bloomberg.com article confirmed the high number of "problematic" P2P lending platforms cited by the CBRC: as of August 2016, a Chinese banking regulator estimated that there were 1,778 "problematic" online P2P lending platforms doing business in China.

32.     Yet, the P2P industry continues to flourish in China due to the country's underdeveloped financial and credit system that leaves many of its citizen unable to obtain financing from traditional financial institutions.

**Yirendai's Corporate Structure**

33.     Yirendai, incorporated in the Cayman Islands in 2014, is a holding company that does not conduct any substantive operations on its own but instead conducts its business operations exclusively through Heng Cheng Technology Development Co., Ltd. ("Heng Cheng"), its variable interest entity ("VIE") located in the People's Republic of China ("PRC").

34.     Chinese companies employee the VIE structure because PRC law imposes certain limitations on direct equity ownership of PRC companies operating in certain strategic industries by wholly foreign-owned enterprises.   The VIE structure, in which a Chinese company forms an offshore company that indirectly controls the operating entity in China via contractual arrangements rather than direct equity ownership, allows a Chinese company operating in those strategic industries to circumvent PRC regulations and raise funds in the U.S. capital markets.   U.S. Generally Accepted Accounting Principles ("GAAP") allows Yirendai to consolidate the operating results of its VIE into Yirendai's financial statements.

35.     Yirendai owns 100% of Yirendai Hong Kong Limited ("Yirendai HK"). Yirendai HK, in turn, owns 100% of Yi Ren Heng Ye Technology Development Co., Ltd. ("Heng Ye").

36.     Heng Ye entered into a series of contractual arrangements ("VIE Arrangements") with Heng Cheng.   Pursuant to the VIE Arrangements, Yirendai, through Heng Ye, obtained effective control over Heng Cheng, including the right to

substantially all of the economic benefits and the obligation to fund all of the expected losses of Heng Cheng.  Hence, for all practical purposes, Heng Cheng is a subsidiary of, and controlled by, Yirendai.

37.   The controlling shareholder of Yirendai is CreditEase Holdings Limited ("CreditEase"), Yirendai's parent company, which owns 85.5% of Yirendai.

38.   The Company's 2015 20-F filed with the SEC provides an illustration of Yirendai's corporate structure:



**Yirendai's Business and Revenue Stream**

39.   Yirendai, through Heng Cheng in China, operates a platform that connects P2P borrowers and lenders.  P2P platforms in China are known to the country's regulators as "peer-to-peer lending information intermediaries", or Information Intermediaries.

40.     Yirendai generates revenue through fees that it charges for matching investors (i.e. lenders) with borrowers.  Yirendai charges borrowers transaction fees for loan facilitation, and it charges lenders service fees for using the Company's "automated investing tool" and its "self-directed investing tool."  The investing tools use computer algorithms to match a lender with a borrower, based on the lender's selected criteria.

41.     Yirendai acquires its borrowers via both online and offline channels. Yirendai states in its 2015 20-F that "Our borrowers and investors come from a variety of channels, including online sources, such as through the internet and our mobile applications, as well as offline sources, such as referrals from CreditEase's on-the-ground sales network."

42.     In fact, a majority of Yirendai's loans and almost half of all borrowers were originated offline.  According to Yirendai's 2015 20-F:

| | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2013 | 2014 | 2015 |
| **Number of borrowers[1]:** | | | |
| Borrowers from online channels | 1,625 | 20,422 | 74,000 |
| Borrowers from offline channels | 1,924 | 18,922 | 72,390 |
| Total number of borrowers | 3,549 | 39,344 | 146,390 |

(1) The number of borrowers for a specified period represents the number of borrowers whose loans were funded during such period. We do not permit borrowers to hold more than one loan that has been facilitated through our platform at a time. A borrower who obtains loans through our platform from both online and offline channels during a period is counted as a borrower acquired from online channels for the purpose of the table above.

| | For the Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2013 | 2014 | 2015 | |
| | RMB | RMB | RMB | US$ |
| | (in thousands) | | | |
| Amount of loans facilitated | 258,322 | 2,228,562 | 9,557,613 | 1,494,010 |
| Loans generated from online channels | 98,512 | 896,003 | 3,152,272 | 492,613 |
| Loans generated from offline channels[1] | 159,810 | 1,332,559 | 6,405,341 | 1,001,397 |

(1) $247.4 million of loans generated from offline channels for the year ended December 31, 2015 were funded through the trust, with which we entered into a business relationship in October 2015. For more information about the trust, please see ""Item 5. Operating and Financial Review and Prospectus—A. Operating Results—Critical Accounting Policies, Judgments and Estimates —Basis of Presentation, Combination and Consolidation."

AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

43.    Yirendai's 2015 20-F makes clear that offline customers go through the entire application process just like their online counterparts.  According to the 2015 20-F:

> As part of both the online and offline application process, the prospective borrower is asked to provide various personal details.  The specific personal details required will depend upon the borrower's desired loan product, but typically include PRC identity card information, employer information, bank account information, credit card information and a credit report from the PBOC.

**The Draft Measures Prohibited Offline Business by P2P Lending Platforms**

44.    In an attempt to regulate the P2P lending industry and crack down on the industry's widespread fraud and illicit activities, in 2015 the Chinese government began drafting a set of measures to tighten regulation on the largely unregulated P2P lending industry.

45.    On December 28, 2015, the CBRC circulated the Draft Measures for comments.  The Draft Measures aimed to regulate the P2P lending industry and curtail the rampant fraud within the industry.

46.    The Draft Measures defined P2P lending platforms as "peer-to-peer lending information intermediaries" ("Informational Intermediaries").

47.    Article 16 of the Draft Measures included a provision limiting the offline activities of P2P lending platforms, or Information Intermediaries.  Article 16 states:

> Article 16: Except for risk management such as collecting credit information, verification, following up after loaning, managing of pledges and certain necessary operations expressly provided for under regulations regarding online loaning, online lending information intermediaries shall not conduct businesses at any physical locations which are not internet, landline, mobile phones and other electronic means.

48.    In other words, Article 16 prohibits Information Intermediaries from engaging in offline business with the exception of certain administrative operations.

49.    Any violation of the Draft Measures after they are put into effect may result in criminal penalties, warning, rectification, tainted integrity record, and monetary fines.

**Yirendai's 2015 20-F Failed to Disclose the Coming Prohibition on Offline Activities**

50.    Yirendai devotes three full pages in its 2015 20-F to discussing the Draft Measures and its potential impact.  Yirendai goes into extensive detail about many of the provisions in the Draft Measures, and how it may possibly affect Yirendai's business.

51.    Curiously missing from Yirendai's warning about the Draft Measures, however, was any meaningful discussion about Article 16 – the prohibition on offline business activities.

52.    Indeed, Yirendai chose to gloss over Article 16, not disclosing to investors the provision that would have the most material impact on the Company's business.  Indeed, Yirendai made only a passing reference to Article 16 that does not come close to apprising investors of the risk posed by this provision:

> The Draft Measures also set out certain additional requirements applicable to Information Intermediaries on, among other things, the real-name registration of lenders and borrowers, **the limitation of offline business of Information Intermediaries**, the risk control, cyber and information security, the limit of fund collection period (up to 10 business days), allocation of charges, personal credit management, file management, lenders and borrowers protection, prohibition on making decisions by Information Intermediaries on behalf of lenders, administration of electronic signatures and information disclosure.

2015 20-F, at 4 (emphasis added).

53.    This is a grossly inadequate Risk Factor disclosure that falls far short of informing investors that a major revenue stream for the Company – *i.e.*, a channel that accounted for about than half of Yirendai's customer base and more than half of the loans facilitated – would be put in jeopardy by the Draft Measures.

54.    Indeed, this meaningless "disclosure" made no mention of the actual limitations imposed on offline business, or how these limitations may potentially impact the Company's business.

55.    Yirendai's effort to gloss over and bury Article 16 is further highlighted by its extensive discussion of other provisions in the Draft Measures.  For example, in

the same Risk Factor section, Yirendai provides the following extensive discussion about the Draft Measures' prohibition on credit enhancement services:

> Moreover, although the Guidelines prohibit online peer-to-peer lending service providers from providing "credit enhancement services," it is uncertain how the "credit enhancement services" mentioned in the Guidelines will be interpreted due to the lack of detailed implementing rules in the Guidelines. However, given (i) the prohibition by the Draft Measures on providing security or guarantee of principals and interests to lenders, and (ii) the requirements mentioned by the CBRC officer during the public forum held on the September 27, 2014, we believe it is generally perceived in the online peer-to-peer lending industry to mean providing guarantees to investors in relation to the return of loan principal and interest. Under our risk reserve fund arrangement, if a loan is delinquent for a certain period of time, we may withdraw a sum from the risk reserve fund to repay investors the principal and accrued interest for the defaulted loan unless the risk reserve fund is depleted. In order to continue to attract new and retain existing investors and to remain consistent with the current industry practice in China, our current risk reserve funding policy aims to have sufficient cash in the risk reserve fund to cover expected payouts, which is based on our current business intention but not legal obligation. Subject to the terms and limits in our agreements with investors, we currently allow investors to fully recover their outstanding principal and accrued interest in the event of loan default. We intend to continue this practice for the foreseeable future. However, as the industry continues to evolve and becomes more sophisticated and our business develops, we may revisit our policy or the terms on which we offer the risk reserve fund service such that investors may recover less than 100% of the outstanding principal and accrued interest of the defaulted loan. Although the purpose of the risk reserve fund is to limit investor losses due to borrower defaults and not to provide investors with guarantees in relation to the return of loan principal and interest, we cannot rule out the possibility that our current risk reserve fund model or any variations thereof might be viewed by the PRC regulatory bodies as providing, to a certain extent, a form of guarantee or otherwise a form of "credit enhancement service" prohibited under the Guidelines. Furthermore, if the risk reserve fund is viewed by the PRC regulatory bodies as providing a form of guarantee, under the Provisions on Several Issues Concerning Laws Applicable to Trials of Private Lending Cases, or the Private Lending Judicial Interpretations, issued by the Supreme People's Court on August 6, 2015 and being effective on September 1, 2015, if requested by the investor with the court, we may be required to assume the obligations as to the defaulted loan as a guarantor. For a summary of the Private Lending Judicial Interpretations, see "Item 4. Information on the Company—B. Business

Overview—Regulation—Regulations Relating to Online Peer-to-Peer Lending—Regulations on Loans between Individuals."

56.    In light of the extensive disclosure about other provisions in the Draft Measures, it is clear that Yirendai made a conscious decision to gloss over Article 16 and pass it off as if it is an afterthought that will have no impact on the Company's business, when in fact, the prohibition on offline business acquisition jeopardize more than half of Yirendai's revenue stream and customer pipeline.  An ordinary investor in the U.S, with no understanding of the Chinese language and no knowledge of how to interpret Chinese law, would not have been able to understand the extent or materiality of Yirendai's omission.

57.    Furthermore, the Implementation Plan for the Special Clean Up Work of P2P Online Lending Risk issued by China Banking Regulatory Commission on April 13, 2016, which included offline marketing as one of the problems and risks for P2P online lending intermediaries, pointed out that this clean-up work should be conducted on the online and offline operations of the market players, sort out the related party relations and regulate them based on its business nature and actual controlling person.[12]  This Plan clearly suggests that the Chinese government treated the offline operations and online operations controlled by one actual common controlling party as one business and such business are not allowed to conduct offline marketing.

58.    Yirendai's 2015 20-F states that "In 2013, 2014 and 2015, 54.2%, 48.1% and 49.5% of our borrowers were acquired through referrals from CreditEase, respectively, contributing 61.9%, 59.8% and 67.0% of the total amount of loans facilitated through our marketplace, respectively."   CreditEase is the major shareholder and related party of Yirendai.  They are both controlled by Ning Tang.  Therefore, pursuant to the Chinese new regulation, Yirendai should not conduct any

_____

[12] http://www.bjjrj.gov.cn/zcfg/c19-a1568.html

offline marketing either by itself or through CreditEase to bypass the restrictions on offline marketing by the P2P online lending intermediaries.

**At the Same Time Yirendai Was Concealing Article 16 and its Impact, Yirendai was Reorganizing Itself to Avoid Violating the Prohibition on Offline Business**

59.     Even though Yirendai made no meaningful disclosure about Article 16 or its potential impact on the Company, Yirendai knew that it would have to reorient its business in order to avoid running afoul of the new regulation.

60.     Confidential Witness 1 ("CW1") is a former manager at Heng Cheng, Yirendai's operating entity.  As the Offline Service Manager, CW1 was responsible for the offline marketing of Yirendai.  He was at his position from July 2013 to March 2016.  According to CW1, shortly before his departure from Heng Cheng, Yirendai conducted a structural re-arrangement whereby the offline business lines at Heng Cheng responsible for offline marketing of Yirendai were dissolved and the personnel from the dismissed business lines were moved to Heng Cheng's online business department.  According to CW1, the CBRC's new regulation prohibiting offline business on the part of Information Intermediaries was a factor in the restructuring.

61.     CW1 further stated that, in his estimation, the prohibition on offline acquisition of customers may cause up to a 20% drop in Yirendai's business.

## THE DRAFT MEASURES BECOME LAW

62.     On August 24, 2016, the Chinese government officially passed the Draft Measures into law, receiving much coverage from the American media, including Bloomberg, Fortune, CNBC, Financial Times, etc.

63.     The Measures passed into law were nearly identical to those in the Draft Measures.   Article 16, the provision prohibiting P2P lending platforms from acquiring customers and conducting marketing offline, was passed into law in substantially the same form:

> Article 16: Online lending information intermediaries may only conduct
> risk management such as collecting credit information, verification,

following up after loaning, managing of pledges and certain necessary operations expressly provided for under regulations regarding online loaning at physical locations which are not internet, landline, mobile phones and other electronic means.

64. The promulgation of the Draft Measures caused Yirendai's ADS to fall $6.92 per share, or 22%, on heavy trading volume on August 24, 2016, damaging investors.

## ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER

**Yirendai Had Just Conducted an IPO and Needed to Maintain Positive Momentum**

65. Yirendai was motivated to conceal negative news about the Company because it had just conducted an IPO on December 18, 2015, only a week before the Draft Measures were disseminated. On information and belief, Yirendai did not want to disclose that the Draft Measures included a prohibition on offline business that would jeopardize half of the Company's revenue stream so soon after the IPO.

66. The desire to maintain momentum and price stability following its IPO incentivized Yirendai to omit any meaningful disclosure about the Draft Measures' prohibition on offline business and its potential impact.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:

### Fraud-on-the-Market Doctrine

67. At all relevant times, the market for Yirendai ADS was an efficient market for the following reasons, among others:

(a) Yirendai's ADS met the requirements for listing, and is listed and actively traded on the NYSE, an highly efficient and automated market;

(b) During the class period, on average, millions of shares of Yirendai ADS were traded on a weekly basis, demonstrating a very active and broad market for Yirendai ADS and permitting a very strong presumption of an efficient market;

(c) As a regulated issuer, Yirendai filed periodic public reports with the SEC and was covered by multiple analysts;

(d)     Yirendai regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)     Unexpected material news about Yirendai was rapidly reflected and incorporated into the Company's stock price during the Class Period.

68.     As a result of the foregoing, the market for Yirendai ADS promptly digested current information regarding Yirendai from all publicly available sources and reflected such information in the price of Yirendai ADS.   Under these circumstances, all purchasers of Yirendai ADS during the Class Period suffered similar injury through their purchase of Yirendai ADS at artificially inflated prices, and a presumption of reliance applies.

## *AFFILIATED UTE*

69.     Neither Plaintiffs nor the Class need prove reliance – either individually or as a class because under the circumstances of this case, positive proof of reliance is not a prerequisite to recovery, pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

70.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Yirendai ADS during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the

1   Company, at all relevant times, members of their immediate families and their legal
2   representatives, heirs, successors or assigns and any entity in which Defendants have
3   or had a controlling interest.

4          71.    The members of the Class are so numerous that joinder of all members is
5   impracticable. Throughout the Class Period, Yirendai ADS was actively traded on the
6   NYSE.  While the exact number of Class members is unknown to Plaintiffs at this
7   time and can be ascertained only through appropriate discovery, Plaintiffs believes
8   that there are hundreds or thousands of members in the proposed Class.  Record
9   owners and other members of the Class may be identified from records maintained by
10  Yirendai or its transfer agent and may be notified of the pendency of this action by
11  mail, using the form of notice similar to that customarily used in securities class
12  actions.

13         72.    Plaintiffs' claims are typical of the claims of the members of the Class as
14  all members of the Class are similarly affected by Defendants' wrongful conduct in
15  violation of federal law that is complained of herein.

16         73.    Plaintiffs will fairly and adequately protect the interests of the members
17  of the Class and has retained counsel competent and experienced in class and
18  securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with
19  those of the Class.

20         74.    Common questions of law and fact exist as to all members of the Class
21  and predominate over any questions solely affecting individual members of the Class.
22  Among the questions of law and fact common to the Class are:

23         •       whether the federal securities laws were violated by Defendants' acts as
24                 alleged herein;

25         •       whether Defendants omitted to disclose material information about the
26                 Company, rendering its public statements false and misleading;

27         •       whether Defendants acted knowingly or recklessly in omitting to
28                 disclose material information;

- whether the prices of Yirendai ADS during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

75. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

76. Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violations of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

77. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

78. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

79. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various

untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of ADS. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Yirendai securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Yirendai ADS at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

80.  Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Yirendai ADS. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Yirendai's finances and business prospects.

81.  By virtue of their positions at Yirendai, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

82.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Yirendai, the Individual Defendants had knowledge of the details of Yirendai's internal affairs.

83.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Yirendai.   As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Yirendai's businesses, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Yirendai ADS was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Yirendai's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Yirendai ADS at artificially inflated prices and relied upon the price of the ADS, the integrity of the market for the ADS and/or upon statements disseminated by Defendants, and were damaged thereby.

84.     During the Class Period, Yirendai ADS were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Yirendai ADS at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said ADS, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Yirendai ADS was substantially lower than the prices paid by

Plaintiffs and the other members of the Class.  The market price of Yirendai ADS declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

85.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

86.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's ADS during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violations of Section 20(a) of The Exchange Act
### <u>Against The Individual Defendants</u>

87.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

88.   During the Class Period, the Individual Defendants participated in the operation and management of Yirendai, and conducted and participated, directly and indirectly, in the conduct of Yirendai's business affairs.  Because of their senior positions, they knew the adverse non-public information about Yirendai's current financial position and future business prospects.

89.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Yirendai's business practices, and to correct promptly any public statements issued by Yirendai which had become materially false or misleading.

90.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Yirendai disseminated in the

marketplace during the Class Period concerning the Company's business, operational and accounting policies.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Yirendai to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of Yirendai within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Yirendai ADS.

91.   Each of the Individual Defendants, therefore, acted as a controlling person of Yirendai.  By reason of their senior management positions and/or being directors of Yirendai, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Yirendai to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Yirendai and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

92.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Yirendai.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B.   Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as her reasonable attorneys' fees, expert fees and other costs; and

1       D.    Awarding such other and further relief as this Court may deem just and

2  proper.

3  **DEMAND FOR TRIAL BY JURY**

4      Plaintiffs hereby demand a trial by jury.

5

6  Dated: January 27, 2017           Respectfully submitted,

7                              **GLANCY PRONGAY & MURRAY LLP**

8                              By:  *s/ Robert V. Prongay*

9                              Robert V. Prongay

10                             Kevin F. Ruf

                            Leanne H. Solish

11                             1925 Century Park East, Suite 2100

12                             Los Angeles, CA 90067

                            Telephone: (310) 201-9150

13                             Facsimile: (310) 201-9160

14                             Email: rprongay@glancylaw.com

15                             **THE ROSEN LAW FIRM, P.A.**

16                             Laurence M. Rosen, Esq.

17                             355 S. Grand Avenue, Suite 2450

                            Los Angeles, CA 90071

18                             Telephone: (213) 785-2610

19                             Facsimile: (213) 226-4684

20                             Email: lrosen@rosenlegal.com

21                             *Counsel for Lead Plaintiffs*

22

23

24

25

26

27

28

24

## PROOF OF SERVICE BY ELECTRONIC POSTING

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.  On January 27, 2017, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 27, 2017, at Los Angeles, California.

_s/ Robert V. Prongay_
Robert V. Prongay

# Mailing Information for a Case 2:16-cv-06437-MWF-AGR Alexandru Lefter v. Yirendai Ltd. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Lionel Zevi Glancy**
  lglancy@glancylaw.com

- **Charles Henry Linehan**
  clinehan@glancylaw.com

- **Virginia F Milstead**
  virginia.milstead@skadden.com,peter.morrison@skadden.com,nandi.berglund@skadden.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Lesley F Portnoy**
  LPortnoy@glancylaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com

- **Kevin F Ruf**
  kruf@glancylaw.com,info@glancylaw.com,kevinruf@gmail.com

- **Howard G Smith**
  howardsmith@howardsmithlaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)